WESTINGHOUSE ELECTRIC
CORPORATION,
Plaintiff,

v.

'21' INTERNATIONAL HOLDINGS,
INC. and '21' International,
Inc., Defendants.

No. 92 Civ. 1430 (JSM).

United States District Court,
S.D. New York.

May 11, 1993.

Dennis J. Block, Stephen A. Radin, Weil Gotshal & Manges, New York City, for Westinghouse Elec. Corp.

Melvyn Leventhal, Meister Leventhal & Slade, New York City, Barry C. Barnett, Susman & Godfrey, L.L.P., Dallas, TX, for '21' Intern. Holdings, Inc. and '21' Intern., Inc.

Robert J. Kopecky, David Stryker, Kirkland & Ellis, Chicago, IL, for Price Waterhouse.

## OPINION AND ORDER

MARTIN, District Judge:

*Background*

On July 26, 1990, plaintiff and counter-claim-defendant Westinghouse Electric Corporation ("Westinghouse") and defendants and counterclaim-plaintiffs '21' International Holdings, Inc. and '21' International, Inc. (collectively, "21 International") entered into an Asset Purchase Agreement (the "APA") under which Westinghouse agreed to purchase substantially all of the assets and assume certain liabilities of counterclaim-defendant Knoll North America, Inc. ("Knoll") from 21 International in exchange for Westinghouse common stock worth $115 million. The value of the shares, and thus the amount of stock to be received, was to be determined solely by reference to an average price of the stock during a period from July 27, 1990 to August 2, 1990. Under the APA, the transaction was to be effected on the Closing Date, set forth as 9:00 a.m. of August 31, 1990. After the parties executed an amendment to the APA (the "Amendment") on August 31, 1990, the transaction was effected in the afternoon of that day.

One of the conditions of the APA was that Westinghouse file a Form S–4 registration statement with the SEC so that 21 International could freely trade the shares of common stock it received. Westinghouse filed a Form S–4 pertaining to these shares on August 10, 1990 and subsequently filed an amendment on August 31, 1990 pertaining to the amendment to the APA (collectively, the "Registration Statement"); the SEC declared the Registration Statement effective as of August 31, 1990. Counterclaim-defendant Price Waterhouse is the accounting firm which prepared the 1989 financial statement incorporated in the Registration Statement.

On February 27, 1991 Westinghouse announced that it would have to take a $975 million charge against pre-tax 1990 earnings due to bad loans held by one of its financial subsidiaries. Additional charges were announced on October 7, 1991 and November 23, 1992 for $1.68 billion and $2.65 billion, respectively, also as a result of problems at the subsidiary.

21 International now claims that certain aspects of the Registration Statement contained material misrepresentations or omissions with regard to the subsidiary's financial condition, including misstatements in the 1989 financial statement, subjecting Westinghouse and Price Waterhouse to liability under § 11 and Westinghouse to liability under § 12(2) of the Securities Act of 1933 and for negligent misrepresentation and breach of contract.[1]

*Discussion*

█ The Securities Act of 1933 was passed to protect investors who purchased securities sold pursuant to a registration statement and prospectus from misstatements by the issuer of the securities. Generally, the party asserting the '33 Act claim is a party who has been induced to part with cash in reliance on statements made by the issuer with respect to its financial condition. In this case, the party asserting the '33 Act claim, 21 International, refused to accept cash from Westinghouse in exchange for the assets of Knoll, insisting instead on receiving stock which would be registered so that 21 International would be free to sell it to the public at some subsequent time. Although 21 International now claims that it was injured as a result of alleged misrepresentations in the Registration Statement, which it allegedly discovered at the time of the February 27 announcement, it neither sold the shares nor sought rescission from Westinghouse at that time. Rather, after watching the stock price drop from a price of $29.125 before the announcement to $26.50 within two days thereafter and then rise to $30 within a week, 21 International continued to hold the stock for 4 months before seeking rescission and did not actually sell the bulk of the shares until after

---

1. Westinghouse, the nominal plaintiff in this case, has sued 21 International for breach of certain terms of the APA that are not directly related to the securities claims involved in this motion and are not themselves the subject of the instant motions. In this opinion, 21 International is often referred to as or analogized to a plaintiff and Westinghouse and Price Waterhouse are often referred to as or analogized to defendants, reflecting more appropriately the postures of these parties.

the October 7 announcement when the price had fallen to $18.

This unusual fact pattern gives rise to the following motions:

Westinghouse moves for summary judgment on 21 International's claims, contending that since 21 International was committed to the transaction before the Registration Statement became effective, it has no claim relating to misrepresentations or omissions in the Registration Statement.

Westinghouse, joined by Price Waterhouse, also moves separately for summary judgment on the grounds that 21 International cannot show any damages, since the price of the stock quickly recovered after the February 27 announcement which 21 International contends disclosed the alleged misstatements.

Price Waterhouse, in a motion in which Westinghouse joins, seeks summary judgment on its statute of limitations defense contending that the February 27 announcement, which 21 International admits put it on notice of the alleged misrepresentation, did not disclose anything that was substantially different from information contained in analyst reports issued prior to December 30, 1990 and therefore 21 was on inquiry notice more than a year prior to December 31, 1991 when it filed its complaint.

■ While there is clearly substantial merit to the arguments made by Westinghouse and a trier of fact is likely to find them persuasive, 21 International has raised two factual issues which preclude granting Westinghouse summary judgment. As will be fully addressed below, Westinghouse would be entitled to summary judgment on its commitment theory were it not for 21 International's evidence that Westinghouse threatened to back out of the transaction and renegotiated the deal on the day the Registration Statement became effective so that, in fact, 21 International was not committed to the transaction until that time.

■ Similarly, while the Court agrees with Westinghouse that the better part of the drop in the market price of its stock cannot be said to have resulted from the alleged misrepresentations, Westinghouse has not shown that the drop in market price after the announcement of October 7, 1991 was not the result of the alleged misrepresentations, so that 21 International might be entitled to recover the difference between the price of the Westinghouse stock the day before that announcement, approximately $21.75, and the prices for which 21 International sold the stock, which were as low as $18 by October 15, 1991 (the date on which 21 International alleges it completed disposal of the stock).

Price Waterhouse's motion on the statute of limitations is granted but similar relief to Westinghouse is denied because the statute was tolled as to Westinghouse during the time a related case was pending in the Western District of Pennsylvania.

*Liability*

Central to Westinghouse's motion for summary judgment on the issue of liability is a determination of when the securities were "sold." Westinghouse argues that the securities were "sold" when the APA was signed, on July 26, 1990, and thus 21 International can have no claim based on disclosures or omissions thereafter.

■ Under prevailing law, securities are considered sold when the parties are obligated to execute the transaction. *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 891 (2d Cir.1972); *see Grondahl v. Merritt & Harris, Inc.,* 964 F.2d 1290, 1294 (2d Cir. 1992) (quoting *Radiation Dynamics*). Although *Radiation Dynamics* defined the purchase date for the purpose of determining materiality in the context of a Rule 10b–5 claim, the standard enunciated, also known as the "commitment theory", *see Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1040 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992), has been applied in § 12(2) cases. *See, e.g. Pell v. Weinstein,* 759 F.Supp. 1107, 1113 (M.D.Pa.1991), *aff'd,* 961 F.2d 1568 (3d Cir. 1992); *SEC v. National Student Mktg. Corp.,* 457 F.Supp. 682, 704 (D.D.C.1978). The application of the commitment theory to claims such as this is based the rationale that "[o]nce the decision is made and the parties are irrevocably committed to the transaction, there is little justification for penalizing al-

leged omissions or misstatements which occur thereafter and have no effect on the decision." *Id.* at 703.

*Pell v. Weinstein* embodied just such reasoning. The court there found that plaintiffs had committed to buying stock under an "Agency Agreement" in which they granted defendant an option to sell the stock or "put", which agreement was entered into before the filing of an allegedly false Form 10-Q. Because "the plaintiffs lacked the power or authority to back out" of the transaction when the allegedly false prospectus was distributed, "the sale could not possibly have been made by means of a prospectus as required by Section 12(2)." 759 F.Supp. at 1114; *see also Department of Econ. Dev. v. Arthur Andersen & Co. (USA)*, 683 F.Supp. 1463, 1474–76 (S.D.N.Y.1988) (Rule 10b–5 action).

*Pell* can be contrasted with *National Student Marketing*, in which an agreement to purchase stock was expressly conditioned on a merger between two companies. There, the court found that purchasers "had no expectation or duty to proceed with the sales if the merger was aborted," 457 F.Supp. at 704, a transaction over which the parties had independent control. The court noted,

> [s]uch a conditional commitment is not what the courts had in mind when setting the time of commitment as the critical point for antifraud analysis. It is not some magical incantation of "commitment" that sets the point at which disclosure is no longer mandated, but rather the nature of the commitment.... [T]he commitment must irrevocably bind the parties to their agreement, without regard to further action or inaction on their part.

*Id.* Therefore, the relevant date of "sale" was the date of the consummation of the merger, rather than the date of the initial agreement. *Id.*

The question is therefore: When was 21 International committed to exchanging assets for Westinghouse stock? 21 International argues that it had numerous opportunities to "back out" of the APA before the closing, and thus the "sale" did not actually occur until the closing. Each alleged opportunity will be discussed in turn.

21 International appears to claim that the transaction was expressly conditioned on Westinghouse filing a registration statement, and that without such a statement the deal would not close. While ¶ 5.2 of the APA did require Westinghouse to file a Registration Statement within fifteen days of the signing of the APA, it also entitled Westinghouse to postpone such filing if it reasonably believed that such disclosure would interfere with its corporate plans. It further provided that if such postponement would "cause the Closing to be delayed," then 21 International could make a written request to proceed with the transaction as a private placement (if it so qualified) and would obtain "demand registration rights" from Westinghouse.

It thus appears that the lack of an effective Registration Statement would not entitle 21 International to back out of the deal, but rather would only give it the option of delaying the closing or converting the transaction into a private placement. Bolstering this conclusion is the fact that Westinghouse's obligations to proceed with the transaction were expressly conditioned on the Registration Statement being effective on the Closing Date (¶ 9.13), thus entitling Westinghouse to back out of the deal if the Registration Statement were not effective; such a provision benefitting 21 International is conspicuously absent.

In any case, since Westinghouse did timely file the Registration Statement and since it became effective on the closing date, 21 International never had an opportunity to back out of the deal. Thus, the APA requirement regarding the Registration Statement did not affect the date of sale.

21 International next contends that it was entitled to terminate the APA because the stock it received was restricted. In ¶ 7.4, Westinghouse represented and warranted that the stock would be "free and clear of all ... restrictions of any kind whatsoever." Paragraph 10.3 expressly conditioned 21 International's obligations on this representation and warranty, *inter alia,* and thus a violation of it would entitle 21 International to back out of the deal. However, there was no such violation.

Part of the Amendment which the parties signed on August 31 included provisions that required 21 International to trade the stock it received only in a manner in conformance with SEC Rules 144 and 145, and mandated the addition of legends on the stock certificates specifying such limitations. Because such limitations were an inherent result of the nature of the deal, *i.e.* a stock-for-assets trade with a dissolving corporation,[2] and must have been contemplated throughout the transaction, they are not the type of restrictions to which ¶ 7.4 applies as reference to the language of the paragraph clearly demonstrates.[3]

21 International similarly argues that it had a right to terminate the APA because the closing took place in the afternoon of August 31 in New York, rather than at 9:00 a.m. in Pittsburgh as set forth in ¶ 13. That the closing take place at a certain time and place was not made an express condition to either party's obligations, and in fact at least one section of the APA (that regarding the Registration Statement) expressly contemplated that the closing might be delayed. *See supra.* Such a minor deviation from a minor term cannot have freed 21 International from its obligations.

21 International claims next that a representation and warranty contained in ¶ 7.2 that "the consummation of the transactions herein contemplated will not result in a breach or violation of ... any applicable laws, [or] rule of regulation of any governmental body having jurisdiction over this Agreement or the transactions contemplated hereby" likewise gave it the right to terminate pursuant to ¶ 10.3 because the alleged misstatements and omissions in the Registration Statement violated a host of securities laws and regulations. This paragraph simply

does not cover the alleged misconduct; clearly a false Registration Statement was not a "transaction [t]herein contemplated" and thus the provision is inapplicable. This reasoning best gives effect to ¶ 10.3 of the APA, as that paragraph expresses the intent of the parties to have Westinghouse make assurances as to the legality of the transaction as contemplated.

21 International makes a related claim that it had a right to back out based on alleged *previous misrepresentations and omissions in* Forms 10–K and 10–Q rendering false a statement of the opinion of counsel for Westinghouse required by ¶ 10.6.4 that "Westinghouse has not taken any action or omitted to take any action giving rise to claims for violation of federal or state security laws." Assuming that such opinion was in fact false, the provisions of ¶ 10.6.4 were nonetheless complied with; 21 International was furnished with an opinion of counsel in conformance with the APA. 21 International thus had no right to terminate the APA on this ground.

However, 21 International has produced evidence tending to show that it had the opportunity to reconsider the transaction on the morning of August 31, 1990, the closing date. According to an affidavit of Philip N. Smith, Jr., general counsel to 21 International *during the summer of 1990,* Westinghouse had threatened to invoke a section of the APA which allowed it to avoid the transaction unless 21 International agreed to certain amendments to the APA; as discussed above, 21 International agreed to and the parties made these amendments on the morning of the closing. *Such facts, if proven,* could establish that 21 International was entitled to call Westinghouse's bluff and drop

---

**2.** Rule 145 places certain restrictions on disposal of stock in a stock-for-assets deal where the company exchanging its assets dissolves soon thereafter; failure to comply with Rule 145 can render purchasers of the stock "underwriters" and thus greatly increase their liability. Rule 144 places certain restrictions on disposal of stock by entities deemed "affiliates" of the issuer.

**3.** Paragraph 7.4 stated that the stock would be "free and clear of all liens, debentures, charges, mortgages, encumbrances, security interests, options, rights of first refusal, claims, suits, pro-

ceedings, preemptive rights, limitations, voting trusts, proxies, charges or restrictions of any kind whatsoever." The obvious thrust of this list is to encompass limitations placed on the securities by Westinghouse or previous transactions, not those which would stem from the contemplated transaction itself. It is noted that had the transaction been altered into a private placement as provided for under the APA, *see supra,* restrictions would of necessity' been placed on the stock.

the deal. Since 21 International had a draft copy of the Registration Statement at that time, it may be able to show at trial that it was re-committing to the transaction at a time after it had been given a prospectus. Accordingly, summary judgment on this ground is not appropriate.

Although the § 12(2) claim is therefore viable because it may have been based on a draft registration statement which 21 International received before entering into the Amendment, an *effective* registration statement is necessary in order to establish liability under § 11. Thus, if the commitment theory applies to § 11, 21 International may have no claim under that section since, as the above discussion indicates, 21 International purchased the securities before the Form S–4 pertaining to them was declared effective.

■ 21 International argues that the commitment theory does not apply to § 11 claims. Section 11 provides in relevant part:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) [has a claim under this section.]

21 International contends that § 11 provides a cause of action to purchasers of securities registered under false registration statements regardless of whether the purchase was committed to before or after the effective date of the Registration Statement. It seeks to distinguish the § 12(2) cases on the grounds that § 12(2) has a reliance component, whereas § 11 contains none.

Westinghouse responds that the purchaser's knowledge defense provided for in § 11 implies the applicability of the commitment theory, reasoning that since 21 International would have had to take the securities even if it did know of the alleged falsities, it is essentially in the position of one who did know of such falsities and purchased anyway, or at least one who has waived defects of this nature.

The plain language of the statute dictates its application to this issue. Section 11 explicitly grants a cause of action to "any person acquiring such security," that is, a security registered by a materially false registration statement, without any reference to a requirement, inference or presumption that the plaintiff might have relied on the registration statement. Reliance is not a factor in a § 11 action, and thus impossibility of reliance can be no bar to a § 11 claim. As long as a plaintiff can show that the particular securities he purchased were registered by means of a materially false registration statement, *Barnes v. Osofsky,* 373 F.2d 269 (2d Cir.1967), he has a claim under § 11.

Westinghouse argues that *Guenther v. Cooper Life Sciences, Inc.,* 759 F.Supp. 1437 (N.D.Cal.1990), the only case cited by either side on this issue, is directly on point. There, certain plaintiffs who had purchased securities after the effective date of a valid registration statement but before the effective date of an allegedly misleading post-effective amendment sought to maintain a § 11 claim based on the amendment. Treating the issue as a problem of "tracing," the court found that the shares the plaintiffs purchased were traceable to the original registration statement and thus the plaintiffs had no claim under § 11 based on the amendment.

*Guenther* is clearly distinguishable. The issue in that case was whether the securities purchased were issued under the registration statement or the subsequent amendment; here, the securities were clearly issued under the Registration Statement and can be traced to it.

### Damages

Westinghouse and Price Waterhouse move for summary judgment on the grounds that 21 International can prove no damages under §§ 11 and 12(2).

### Section 11 Damages

Section 11 provides, in relevant part, that the successful plaintiff may

recover such damages as shall represent the difference between the amount paid for the security (not to exceed the price at

which the security was offered to the public) and (1) the value thereof as of the time the suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit,.... Provided, that if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement ... not being true or omitting to state a material fact ... such portion or all such damages shall not be recoverable.

Westinghouse and Price Waterhouse contend that there is no genuine issue of fact that price movements in three consecutive periods, specifically from (1) July 26, 1990 to August 31, 1990, (2) August 31, 1990 to February 26, 1991, the day before the announcement, and (3) February 27, 1991 to October 15, 1991, the date on which 21 International alleges it completed disposing of all the securities, were not a result of the falsity of the Registration Statement, and they have thereby proved that all damages are not recoverable. While 21 International concedes that declines in the price during the first two periods are not attributed to the falsity of the Registration Statement, Memorandum in Opposition—Damages p. 5., it contends that there is a genuine issue of material fact as to the decline in the third period.

As set forth in § 11, the defendant bears the burden of showing that any decline in price was not caused by the misrepresentations. "Defendants' heavy burden reflects Congress' desire to allocate the risk of uncertainty to the defendants in these cases. Defendants' burden, however, is not insurmountable; section 11(e) expressly creates an affirmative defense of disproving causation." *Akerman v. Oryx Comm., Inc.,* 810 F.2d 336, 341 (2d Cir.1987) (citations omitted).

Although the price of Westinghouse's stock initially dropped following the February 27, 1991 announcement, by March 5 it had returned to its February 26 level. It remained at or above that level until March 15,[4] and it traded above that level on various days thereafter up to June 20, 1991. Westinghouse argues that this history demonstrates that the market, once it had a chance to absorb and digest the information contained in the announcement, did not value the stock any less, and therefore no part of the decline resulted from alleged falsities in the Registration Statement. 21 International responds that the stock declined to roughly two-thirds of its mid-March level by October 15, 1991, and submits an affidavit of a CEO of an investment banking firm which tends to indicate that the decline in price was due to the alleged misrepresentations.

■ On the record before this Court, it is clear that the loss 21 International suffered as a result of the decline in the market price between February 27, 1991 and the October 7, 1991 announcement did not result from the alleged falsities in the Registration Statement.

As of February 27, 1991, 21 International was on notice of the alleged misstatements but it did not dispose of its stock or seek

4. The closing price of Westinghouse common stock from February 26, 1991, the day before the announcement, to March 15, 1991 was as follows:

| Date | Price | Date | Price |
|---|---|---|---|
| 2/26/91 | $29 1/8 | 3/07/91 | $30 — |
| 2/27/91 | $27 1/4 | 3/08/91 | $29 1/8 |
| 2/28/91 | $26 1/2 | 3/11/91 | $29 1/4 |
| 3/01/91 | $27 3/8 | 3/12/91 | $29 — |
| 3/04/91 | $28 — | 3/13/91 | $29 1/4 |
| 3/05/91 | $29 5/8 | 3/14/91 | $29 3/4 |
| 3/06/91 | $30 1/8 | 3/15/91 | $29 — |

rescission. It made a new investment decision to play the market by retaining its Westinghouse shares. Thus, the damages between that date and the October 7, 1991 announcement of additional write-offs resulted from its new investment decision, not from the alleged misstatements in the Registration Statement ostensibly disclosed by the February 27 announcement. In addition, a review of the daily closing prices thereafter demonstrates that there was no price movement that would support a claim that 21 International was damaged as a result of the alleged misstatements prior to the additional $1.68 billion write-off announced on October 7, 1991. That the price of Westinghouse common stock recovered to its pre-announcement level within five trading days of February 27, 1991 and traded without dramatic fluctuation for a substantial period thereafter shows that the market did not change its valuation of Westinghouse common stock because of the February 27, 1991 announcement. While the stock did drift down from $29⅞ on June 20, 1991 to $21 on October 6, 1991, there was no unusual activity which could reasonably be argued to trace back to the alleged misstatements in the Registration Statement.

However, the stock did fall dramatically from $21¾ the day before the October 7 announcement to $18 on October 15, 1991, the day 21 International allegedly completed selling its stock. Thus, while Westinghouse is correct that any drop in the stock prior to October 7 was not a result of the alleged misstatements in the Registration Statement, there is a genuine issue of material fact as to whether the loss 21 International suffered between October 7 and October 15 resulted from the alleged misrepresentations.

*Section 12(2) Damages*

21 International contends that even if Westinghouse's arguments regarding damages are valid with respect to the § 11 claim, under § 12(2) it is entitled to rescissionary damages and therefore to recover the difference between the price it paid for the stock and the price it obtained when it sold.

Under § 12(2), a successful plaintiff is entitled "to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." Thus a plaintiff is entitled to rescission or damages. Damages are not limited to standard contract damages, but rather encompass "a rescissionary measure of damages ...; the plaintiff is entitled to a return of the consideration paid, reduced by the amount realized when he sold the security and by any 'income received' on the security." *Randall v. Loftsgaarden*, 478 U.S. 647, 656, 106 S.Ct. 3143, 3149, 92 L.Ed.2d 525 (1986); *see Casella v. Webb*, 883 F.2d 805, 808 (9th Cir.1989). Furthermore, unlike damages under § 11, causation is irrelevant under § 12(2). *Casella*, 883 F.2d at 808; *Metromedia Co. v. Fugazy*, 753 F.Supp. 93, 97 (S.D.N.Y.1990), *aff'd*, 983 F.2d 350 (2d Cir.1992). Such a harsh result was fully intended, as the Supreme Court has noted: "Congress shifted the risk of an intervening decline in the value of the security to defendants, whether or not that decline was actually caused by the fraud." *Randall*, 478 U.S. at 659, 106 S.Ct. at 3151.

Westinghouse argues that a plaintiff seeking rescission under § 12(2) must make such demand promptly upon learning of the misrepresentation or forfeit the remedy. This requirement, long a requisite for equitable rescission at common law, and more recently imposed when rescission is sought under Rule 10b–5 and § 17, is also applicable to a claim for rescission or rescissionary damages in § 12(2) actions. *Gannett Co. v. Register Pub. Co.*, 428 F.Supp. 818 (D.Conn.1977). In *Gannett*, Judge (now Circuit Judge) Newman noted that the "legal standards to be applied in determining whether an injured party is entitled to rescission for violation" of Rule 10b–5 and §§ 12(2) and 17 "are essentially the same as the standards developed in common law fraud cases." *Id.* at 827. Judge Newman then proceeded to explain the persuasive rationale for requiring an immediate demand for rescission: "A party could otherwise sit back without notification to the wrongdoer and, within the allowable period to sue, watch the market go up or down, thereby speculating on the success or value at the total risk of the wrongdoer." *Id.* at

828 (quoting *Myzel v. Fields,* 386 F.2d 718, 740–41 n. 15 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968)). While the Supreme Court has condoned such an extraordinary "no lose" situation under § 12(1) in approving the *in pari delicto* defense, *see Pinter v. Dahl,* 486 U.S. 622, 637 n. 13, 108 S.Ct. 2063, 2073 n. 13, 100 L.Ed.2d 658 (1988), there is no such authoritative pronouncement nor comparably compelling considerations of policy to justify this result in the very different context of a § 12(2) action.[5]

■ 21 International, arguing that no such requirement is justified for a § 12(2) claim, cites the Eighth Circuit's holding that § 12(2) does not require any demand for rescission: "All that is required is that the claim be made within the applicable statute of limitations." *Austin v. Loftsgaarden,* 675 F.2d 168, 179 (8th Cir.1982). However, we note that *Loftsgaarden* reached the Supreme Court after remand, where the Eight Circuit's holding was called into question. *Randall v. Loftsgaarden,* 478 U.S. 647, 656, 106 S.Ct. 3143, 3149, 92 L.Ed.2d 525 (1986). Although demand for rescission was not at issue in the remanded case, and thus not squarely before the Court, the Court went out of its way to touch on the issue. It first specifically noted that both the District Court and the Court of Appeals below had covered the issue of prompt demand during the initial round of litigation, both having rejected a demand requirement for § 12(2) rescission. 478 U.S. at 652, 106 S.Ct. at 3147; *see Austin v. Loftsgaarden,* 675 F.2d at 179. Then, after ruling that rescission under § 12(2) did not require an offset for tax benefits received under the original transaction, the Court addressed the argument that its ruling might give plaintiffs "an incentive to wait to raise their § 12(2) claims until they have received the bulk of tax benefits available from a tax shelter, since after their securities are tendered they will cease to receive tax benefits."

478 U.S. at 666, 106 S.Ct. at 3154. The Court responded,

> We are not persuaded .... that courts lack adequate means to deal with any potential for abuse on this score. In cases under § 10(b), some courts have barred plaintiffs from electing rescission, or a rescissionary measure of damages, where they delayed tender or suit in order to increase their expected recovery should the market decline. A similar rule may well be appropriate where plaintiffs delay tender or suit in order to obtain additional tax benefits, although we need not decide so today.

*Id.* (citations omitted). Thus, the Eighth Circuit's previous holding that no prompt demand is necessary for a § 12(2) action may well be questionable law; in any case it is not binding on this Court. Furthermore, the Supreme Court's opinion in *Loftsgaarden* implicitly supports our holding today that plaintiffs must make a prompt demand for rescission in order to rescind or obtain rescissionary damages under § 12(2). There is nothing inequitable in this result, since 21 International is still entitled to recover the actual damages it suffered as a result of any misrepresentation in the draft registration statement. *Gannett,* 428 F.Supp. at 841; *see* discussion of § 11 damages, *supra.*

■ 21 International argues that if the *Gannett* rule is applicable, it has presented evidence that it was in settlement negotiations during the period from February 27 to June 28, and thus there is a factual issue as to whether it complied with a duty to demand rescission promptly. There is no such issue. Regardless of whether 21 International entered into settlement negotiations, it has neither claimed nor presented evidence that it made any demand for rescission prior to June 28, 1991, more than three months after it alleges that it learned of the grounds for this § 12(2) claim. Nothing precluded 21 International from making a demand for rescission at the same time as it expressed a willingness to resolve its claims amicably.

---

5. Section 12(1) makes actionable the public sale of unregistered securities, thus providing the seller with a "strong incentive to comply with the registration disclosure provisions [which] are concerned with affording the unsophisticated investor information necessary to make a knowl-

edgeable investment decision." *Pinter,* 486 U.S. at 637 n. 13, 108 S.Ct. at 2073 n. 13. In contrast, § 12(2) establishes liability for negligent misstatements where an issuer has attempted to comply fully with disclosure requirements.

This undisputed delay is fatal to its claim under § 12(2).

### Statute of Limitations
### Inquiry Notice

Price Waterhouse moves for dismissal of the § 11 claim against it based on the statute of limitations contained in § 13. Westinghouse joins in this motion as to the §§ 11 and 12(2) claims asserted against it.

Section 13 provides that claims under §§ 11 and 12(2) must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." The burden is on the party seeking to establish liability, in this case, 21 International, to "plead and prove facts demonstrating compliance" with this limitations period. *In re Chaus Sec. Litig.*, 801 F.Supp. 1257, 1265 (S.D.N.Y.1992).

▌ Under § 13 as applied to §§ 11 and 12(2) claims, the limitations period begins to run at the time the plaintiff is on "inquiry notice", *i.e.* the time at which he has constructive knowledge sufficient "to suggest to a person of ordinary intelligence the probability that he has been defrauded." *Acacia Nat'l Life Ins. Co. v. Hollis*, 991 F.2d 968, 979 (2d Cir.1993) (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983)).[6]

The plaintiff's subjective beliefs are irrelevant; an objective standard will determine whether plaintiff was on "inquiry notice". *Armstrong*, 699 F.2d at 88. Thus, a plaintiff is charged with knowledge of publicly available news articles and analysts' reports. *Acacia*, 991 F.2d at 977.

Once the plaintiff is on "inquiry notice", the limitations period begins to run unless it is tolled by the plaintiff exercising reasonable diligence in investigating its claims. *Slavin v. Morgan Stanley & Co.*, 791 F.Supp. 327, 330–31 (D.Mass.1992); *Chaus*, 801 F.Supp. at 1267.

▌ Price Waterhouse claims that 21 International had "inquiry notice" of the claim prior to December 31, 1990, the date one year before suit was actually filed.[7] Price Waterhouse's contention is based in large part on various analyst reports which raised the distinct possibility of massive write-offs in the near future, and which were publicly available (and some of which were considered by 21 International) prior to December 31, 1990. While it is true that no report explicitly questioned the accuracy of the 1989 financial statement at issue in this case, it is also true that the reports do not differ qualitatively from the February 27, 1991 announcement from which 21 International admits it gained notice of the alleged misstatements, save for the degree of certainty implied by

6. The parties debate what degree of notice the plaintiff must have before he is considered on "inquiry notice". Price Waterhouse contends that inquiry notice begins when the plaintiff has knowledge sufficient to indicate the *possibility* of fraud, whereas 21 International argues that the knowledge must establish the *probability* of fraud. The preponderance of case law agrees with Price Waterhouse's position. *See, e.g. Chaus*, 801 F.Supp. at 1266 (Section 11 plaintiff must file when "possibility of fraud should have been apparent"); *Miller v. Grigoli*, 712 F.Supp. 1087, 1092 (S.D.N.Y.1989) (same for § 12(2)); *Quantum Overseas, N.V. v. Touche Ross & Co.*, 663 F.Supp. 658, 663 (S.D.N.Y.1987) (Section 11). The cases cited by 21 International employing a standard of probability rather than possibility, *see, e.g. Armstrong*, 699 F.2d at 88; *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.*, 815 F.Supp. 620 (S.D.N.Y.1993); *Zola v. Gordon*, 685 F.Supp. 354, 363 (S.D.N.Y.), *reh'g granted*, 701 F.Supp. 66 (S.D.N.Y.1988), all involve claims under § 10(b) and Rule 10b–5, which by their nature require a heightened specificity of pleading and so extend the commence-

ment of the limitations period appropriately. The recent Second Circuit opinion in *Acacia* seems to indicate that a plaintiff must be on notice of "the probability that he has been defrauded," 991 F.2d at 979 (quoting *Armstrong*, 699 F.2d at 88); however, that case too involved a parallel § 10(b) claim. Although the cases employing a possibility standard would appear to contain the sounder reasoning, we assume without deciding that a plaintiff must have constructive notice of the probability of fraud in order to trigger the one-year statute of limitations contained in § 13.

7. Suit was filed on December 31, 1991 in Texas state court, and was there dismissed on forum non conveniens grounds, on the condition that the parties agree to waive any statute of limitations defenses accruing after December 31, 1991. It is undisputed that December 31, 1991 is the critical date of filing for statute of limitations purposes, even though this suit was actually filed later than that, and 21 International's counterclaims were filed later still.

the difference in sources. The write-off of $975 million announced on February 27 was clearly anticipated by documents that were publicly available prior to December 30, 1990, including the following:

A July 19, 1990 report from Shearson Lehman Brothers opining that "asset portfolios could be under water by hundreds of millions."

A September 27, 1990 report from First Boston noting a "moderate possibility" of a major writedown, contemplating a worst case writedown of $508 million.

A November 8, 1990 report from A.G. Edwards & Sons hypothesizing a "worst-case scenario" of a $1 billion one-time writedown.

A December 11, 1990 report from Shearson Lehman Brothers projecting a writeoff of between $151 million and $905 million.

A December 12, 1990 report from County Natwest, USA, indicating that "negative adjustments of several hundred million dollars are not out of the question," and that "the problems ... could prove to be much more serious than currently envisioned by most investors."

Other reports contain similar information and statements. If 21 International received notice from the February 27 announcement, it must have been put on inquiry notice by the wealth of ominous warnings months earlier.

21 International's attempts to evade this conclusion are unavailing. An undated, unauthenticated and likely inadmissible memorandum apparently from Lazard Freres to Westinghouse, even if appropriate for consideration on summary judgment, does not put into issue that many other analysts were publicly issuing statements giving rise to the same concerns as the February 27 announcement. Likewise, that most of the analysts' reports were optimistic about Westinghouse common stock and indicated that Westinghouse could withstand even the worst-case write-off without much detriment is irrelevant. Whether or not Westinghouse common stock was a good investment is not at issue; the question is whether these reports should have caused 21 International to have been aware of its claim of material misstatements in the Registration Statement.

21 International argues that *Acacia,* which the Second Circuit termed a "paradigm for the denial of a summary judgment," 991 F.2d at 981, mandates dismissal here. However, *Acacia* is clearly distinguishable. There, analysts' reports, described as "guarded", "detected at most distress signals," *id.* 991 F.2d at 981. The Court of Appeals was not faced, as we are here, with publicly available information that presaged the very developments which plaintiffs assert placed them on notice of their claims.

Thus, the remaining issue is whether 21 International exercised due diligence in investigating the claims it asserts here. 21 International contends that it investigated its claim by means of reviewing analyst reports and examining Westinghouse's publicly available documents, among them a January 17, 1991 announcement of record profits and predicted earnings. 21 International's only active investigation was to attend Westinghouse analysts' meeting on October 24, 1990, at which management assured the audience that reserves were adequate and earnings would be as predicted. However, plaintiffs charged with a duty to investigate may not merely rely on reassurances given by management. *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,* 815 F.Supp. 620 (S.D.N.Y.1993); *Zola v. Gordon,* 685 F.Supp. 354, 366 (S.D.N.Y.), *reh'g granted,* 701 F.Supp. 66 (S.D.N.Y.1988).[8] Plaintiffs who are on inquiry notice as to a § 11 or § 12(2) claim, especially those who are sophisticated investors and possess significant shareholder leverage, must do more than watch the market, worry about analyst reports, and accept managerial reassurances before there can be a genuine issue of material fact as to whether they have diligently investigated their claims sufficient to toll the limitations period.

The above analysis applies equally to 21 International's § 11 and § 12(2) claims against Westinghouse.

**8.** Although *Integrated Resources* and *Zola* both involved a duty to investigate actual fraud under

Rule 10b–5, their declaration of the scope of plaintiff's duty is equally applicable here.

*American Pipe Tolling*

21 International contends that even if the one-year statute of limitations would normally be found to bar its claims against Westinghouse, those claims have been tolled during the pendency of a related class action under the doctrine announced in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), and extended in *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983). Under *American Pipe* and *Crown*, class actions toll the statute of limitations as to all plaintiffs who would have been members of the class.

On April 12, 1991, Abraham Joselow filed a class action suit against Westinghouse in federal district court in Pennsylvania.[9] The complaint asserted claims under §§ 11 and 12(2), *inter alia*, and alleged a class of

> all persons who purchased the publicly-traded securities of Westinghouse during the period from approximately March 8, 1988 through and including February 28, 1991 (the "Class Period"). Included within the Class are all persons who purchased the securities of the Company or its subsidiaries pursuant to registration statements and prospectuses declared effective during the Class Period.

On August 3, 1992, Joselow dismissed the § 11 and § 12(2) claims, *inter alia*, without prejudice; the Stipulation and Order dismissing these claims recited that they had been alleged by other plaintiffs in an amended complaint of related consolidated cases, although 21 International does not contend that the amended consolidated complaint likewise includes its § 11 and § 12(2) claims, and in fact the alleged consolidated class period commenced on October 24, 1990, two months after the transactions at issue here. 21 International now claims that the statute of limitations period should be tolled during the period of the viability of the Joselow complaint, *i.e.* from April 12, 1991 to August 3, 1992, under the *American Pipe* doctrine.

Westinghouse opposes on two grounds. First, it claims that the failure of the Joselow complaint to allege claims based specifically on the August 31, 1991 Registration Statement renders the tolling doctrine unavailable to 21 International. Second, it claims that 21 International should be barred from receiving the benefits of the tolling due to representations it made in this litigation.

▋ Westinghouse claims that the Joselow complaint provided inadequate notice of 21 International's claim to justify tolling. It points out that the complaint itself may have been subject to dismissal for failure to allege the particular registration statements and prospectuses at issue, *see Bresson v. Thomson McKinnon Sec., Inc.*, 641 F.Supp. 338, 342 (S.D.N.Y.1986); *but see Ferber v. Travelers Corp.*, 785 F.Supp. 1101, 1111 (D.Conn. 1991) (dismissing §§ 11, 12(2) claims for failure to allege particularity under Fed.R.Civ.P. 9(b), a rule whose application has been rejected in this case), *reh'g granted on other grounds*, 1992 WL 34683 (D.Conn.1992), arguing that such inadequacy coupled with the distinctive and somewhat more limited nature of the August 31, 1990 Form S–4 Registration Statement as against registration statements used in public offerings demonstrates that 21 International was not a member of the alleged class and the claims it presents here are distinct from that action, justifying a denial of tolling. *See Crown*, 462 U.S. at 354, 103 S.Ct. at 2398 ("tolling rule of *American Pipe* is a generous one, inviting abuse. . . . The rule should not be read [ ] as leaving a plaintiff free to raise different or peripheral claims"); *Korwek v. Hunt*, 827 F.2d 874, 877 (2d Cir.1987) (*Crown* intended to "afford class members greater flexibility . . . while remaining ever vigilant of defendants' need to be put on notice of adverse claims"); *Camotex, S.R.L. v. Hunt*, 741 F.Supp. 1086, 1091 (S.D.N.Y.1990) (failure of complaint to give "adequate notice to prepare a defense against a sub-group's specialized grievances" results in denial of tolling rule). However, the complaint's allegation of a class, read literally, clearly encompasses the Registration Statement at issue here, and so 21 International would have been included in the alleged class. Whether the complaint

---

9. Since Price Waterhouse was not a party to the Joselow action, that complaint cannot toll the limitations period on the § 11 claim asserted against it.

was subject to dismissal for failure to identify the particular registration statements at issue is irrelevant for the purposes of applying the "generous" *American Pipe* doctrine; the limited scope of the time period and bases alleged in the Joselow complaint provided Westinghouse with sufficient notice of 21 International's claim against it.

Westinghouse argues that even if the Joselow complaint could be read to include the claims 21 International raises here, a letter sent to this Court by 21 International on October 2, 1992 bars 21 International from invoking the tolling rule. That letter stated clearly 21 International's position that the Pennsylvania suits did not involve the claims at issue here. Although this was actually true as of October 2, 1992, due to the dismissal of the Joselow complaint and failure of the amended consolidated complaint to include 21 International's claims, Westinghouse argues that 21 International could not have known of these events because those documents had been sealed, and so 21 International must have been representing its interpretation of the Joselow complaint. Even if 21 International were to be held to its prior interpretation of the Joselow complaint, it is far from clear that the representations made by 21 International were based on the Joselow complaint itself,[10] and therefore no basis exists for holding them to such statements for tolling purposes. Consequently, the Joselow complaint tolled the statute of limitations as against Westinghouse from April 12, 1991 to August 3, 1992, and thus 21 International's claims were timely filed.

*State Law Claims*

Westinghouse also moves to dismiss the two state law claims 21 International asserts for negligent misrepresentation and breach of contract. It contends that the negligent misrepresentation claim should be dismissed for the same reasons that it argued for dismissal of the § 12(2) claim, namely that 21 International was committed to the transaction before any alleged misrepresentations were made. Since, as the above discussion

indicated, there is a genuine issue of material fact as to when 21 International was committed to the transaction, the negligent misrepresentation claim will survive for the same reasons that the § 12(2) claim does.

However, the breach of contract claim will be dismissed. 21 International's complaint alleges breach of the APA, and specifically claims violation of ¶¶ 7.2 and 7.4. The earlier analysis of these two paragraphs demonstrates that there is no genuine issue of material fact that no breach of contract occurred based on these paragraphs.

SO ORDERED.

---

**10.** Evidence submitted by 21 International indicates that at the time the representations were made 21 International had reason to believe that the Joselow complaint had been dismissed and

had received assurances from Westinghouse's in-house counsel that the Pennsylvania actions did not include the claims 21 International asserts here.