[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 2, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-15936

_____

D. C. Docket No. 99-01377-CV-JOF-1

APA EXCELSIOR III L.P.,
APA EXCELSIOR III OFFSHORE L.P, *et al.*,

Plaintiffs-Appellants,

versus

PREMIERE TECHNOLOGIES, INC.,
BOLAND T. JONES, *et al.*,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(February 2, 2007)**

Before ANDERSON and DUBINA, Circuit Judges, and VINSON,* District Judge.

VINSON, District Judge:

---

*Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

The lawsuit underlying this appeal was filed in 1998. It arose from a stock-for-stock merger and acquisition between Xpedite Systems, Inc., and Premiere Technologies, Inc. The case is before us for a second time. As will be discussed in Part I *infra*, the claims and issues have been winnowed over the years and we are now faced with what is tantamount to a single question: Are sophisticated investors involved in an arms-length merger transaction entitled to recover under Section 11 of the Securities Act of 1933 if they make a legally binding investment commitment months before the issuance of a defective registration statement?

## I. BACKGROUND

Plaintiffs are investment funds and individuals who are former shareholders of Xpedite Systems, Inc. ("Xpedite"). Xpedite, a Delaware corporation, was formed in 1988 to provide enhanced facsimile and messaging delivery services. Plaintiffs APA Excelsior III L.P., APA Excelsior III Offshore L.P., APA/Fostin Pennsylvania Venture Capital Fund, and CIN Venture Nominees Limited (collectively, "the Plaintiff Funds") are investment funds managed by Alan Patricof Associates ("APA"). Plaintiffs Stuart and David Epstein are brothers who invested in Xpedite as individual investors. Together, Plaintiffs held approximately 30 percent of the stock of Xpedite. Due to the Plaintiff Funds' substantial holdings in Xpedite, a representative from APA, Robert Chefitz, served

2

as a member of Xpedite's board of directors ("the board"). Similarly, due to the Epsteins' holdings in Xpedite, David Epstein sat on the board.

In 1997, Xpedite began to consider strategic alternatives to provide an exit strategy for Xpedite's early investors, which included Plaintiffs. In February 1997, the board appointed a special committee to evaluate Xpedite's alternatives and to engage advisors. Members of the special committee included Chefitz (who testified at deposition that he may have actually been chair of the committee) and David Epstein, among others.

During this process, contact was made with Defendant Premiere Technologies, Inc. ("Premiere"), which expressed an interest in acquiring Xpedite. Premiere, now known as PTEK Holdings, Inc. or Premiere Global Services, Inc., is in the business of providing telecommunication services, including conference calling, voice messaging, and telephone calling card-related services. Premiere proposed a stock-for-stock merger and acquisition, which Xpedite felt was an attractive proposal. On October 31, 1997, Xpedite — through its senior officers, investment banker (Merrill Lynch), accountants (Ernst & Young), and legal counsel (Paul, Hastings, Janofsky & Walker LLP) — began its due diligence investigation of Premiere. The special committee on which Chefitz and David Epstein sat had oversight responsibility for this investigation.

3

As we noted in our prior opinion, and as recognized by the district court on remand (which has not been seriously challenged in this appeal), Plaintiffs were sophisticated investors with due diligence rights, but they failed to exercise them in any meaningful way. For example, Chefitz testified that he did not direct anyone to examine Premiere's key telephone calling card customers, he did not negotiate for specific warranties regarding the calling card business, and he did not direct anyone to perform due diligence as to the technical capacity of the calling card business's software platform. Roy Anderson, Xpedite's former CEO, told Chefitz that Premiere's contract and business dealings with a particular telephone calling card customer, DigiTEC 2000, Inc. ("DigiTEC"), were important to Premiere's revenues. However, Chefitz did not recall performing any examination of the DigiTEC account, other than reviewing some of the company's public materials, nor did he recall directing anyone to make contact with that company as part of the due diligence efforts. Further, although Chefitz believed Xpedite's due diligence team had access to Premiere's accounts receivable for the telephone calling card business, Chefitz did not review them personally or direct anyone else to do so.

Despite this apparently superficial due diligence, on November 13, 1997, the board entered into a merger agreement with Premiere (agreeing to the stock-

4

for-stock transaction) and unanimously voted to recommend the merger to Xpedite's shareholders. As a condition of entering into the merger agreement, and in order to have some assurance of a favorable merger vote by the shareholders, Premiere required all Plaintiffs and some of the other shareholders to execute stockholder agreements. Under these stockholder agreements, Plaintiffs granted irrevocable proxies to Premiere to vote their Xpedite stock in favor of the merger:

> SECTION 1.01 VOTING AGREEMENT. The Stockholder hereby agrees that . . . the Stockholder shall vote (or cause to be voted) the Shares and the Other Securities [in Xpedite] in favor of the Merger [with Premiere]. . . .
>
> * * *
>
> SECTION 1.02 IRREVOCABLE PROXY. The Stockholder hereby irrevocably appoints [Premiere] and each of its officers . . . to vote and otherwise act (by written consent or otherwise) with respect to the Shares and Other Securities, which the Stockholder is entitled to vote at any meeting of stockholders of the Company. . . .

The stockholder agreements were terminable/voidable only upon the termination of the merger agreement or at the effective time of the merger itself, whichever occurred first. Premiere also required Plaintiffs (except Stuart Epstein) and others to execute affiliate letters, setting forth potential limitations on the transferability of the Premiere securities they would receive upon consummation of the merger.

5

By executing the affiliate letters, Plaintiffs acknowledged that a restrictive legend would be placed on the Premiere common stock they were to receive in the merger. Notably, Plaintiffs warranted in the affiliate letters that they understood Premiere was "*under no obligation to file a registration statement with the [Securities and Exchange Commission ("SEC")] covering the disposition of [their] shares*." (Emphasis in original).

More than two months later, on January 28, 1998, Premiere's registration statement for the Xpedite merger became effective. On February 27, 1998, a majority of both Xpedite's and Premiere's shareholders voted to approve the merger. Upon consummation of the merger, all Xpedite shareholders received 1.165 shares of Premiere common stock for each share of Xpedite stock they owned. Pursuant to the merger agreement, the exchange ratio was determined by reference to the average closing price of Premiere stock for a predetermined period of time.

On June 9 and 10, 1998, Premiere announced that it would have a shortfall in its revenues, and that it would be taking a charge against its bad debt reserves. This was a development not mentioned in the registration statement. On June 10, 1998, the price of Premiere stock dropped from $14.4375 per share to $10.375 per share, a one-day decline of 28 percent and an overall decline of 69 percent from

the merger price.[1]

In November 1998, within months after the Premiere stock price dropped and before it rebounded, Plaintiffs filed the underlying lawsuit and named Premiere and certain of its directors and officers as Defendants. In their complaint, Plaintiffs asserted claims for breach of contract, negligent misrepresentation, and violations of several different provisions of the Securities Act of 1933 ("the Securities Act"). As is relevant for the Securities Act claims and this appeal, Plaintiffs contended that the decline in stock price was the result of numerous material defects in the registration statement. These allegedly false and misleading statements or omissions generally concerned Premiere's financial condition and expected growth. Specifically, Plaintiffs alleged that Premiere had overstated its prior acquisitions of and attempts to integrate two voice messaging businesses (Voice-Tel Enterprises and VoiceCom Holdings, Inc.); it misrepresented the status and viability of a particular product, "Orchestrate" (a comprehensive suite of integrated communication services, such as universal messaging with voice mail, facsimile and email, and conference calling); it failed to disclose that Premiere was

---

[1]This downturn was temporary. Defendants have argued without contradiction that within one year, Premiere's stock price had rebounded to more than $20.00 per share — a 100% increase from the low in June 1998. Notwithstanding the decrease in stock price, Chefitz testified at deposition that the Plaintiff Funds realized a 500% return on their initial investment in Xpedite.

experiencing dramatic declines in revenue from its business relationship with two other entities (DigiTEC and Amway Corporation); and it touted that Premiere had a "strategy" to become "the world's leading provider of network-based enhanced personal communication services," yet Premiere lacked sufficient internal controls and management capability to manage its growth and integrate its acquisitions, as well as to properly assess customer credit risk. Plaintiffs alleged that these misstatements and omissions were material and that they violated Section 11 of the Securities Act [15 U.S.C. § 77k] ("Section 11").[2]

The district court dismissed the contract claim and certain of Plaintiffs' Securities Act allegations, after which the parties engaged in discovery. Thereafter, the district court granted summary judgment to Defendants on Plaintiffs' remaining Securities Act claims (concluding, *inter alia*, that Plaintiffs lacked standing because they acquired the securities through a private offering), and on Plaintiffs' negligent misrepresentation claims (concluding that Plaintiffs could not establish that they reasonably relied on the alleged misrepresentations). This summary judgment ruling was appealed to this court and set the stage for the decision reached by the prior panel.

---

[2]Defendants deny that the registration statement contained any misstatement or omission. We need not resolve this dispute. For purposes of this opinion, we will assume that the registration statement was defective for the reasons alleged by Plaintiffs.

In the first appeal, we affirmed summary judgment in favor of Defendants as to Plaintiffs' negligent misrepresentation claims, but we reversed as to the lack of standing on the Securities Act claims. *See generally APA Excelsior III L.P. v. Premiere Technologies, Inc.* (No. 03-15552, Sept. 23, 2004, 11th Cir.) (unpublished opinion). As for the negligent misrepresentation claims, we concluded that Plaintiffs had failed to exercise reasonable due diligence despite the fact that they knew or should have known of the general problems of which they complained. *Id.* at 17-24. We specifically stated that Plaintiffs were on notice of the problems with Premiere integrating new acquisitions, the possibility of difficulties in launching the Orchestrate product, and Premiere's general business relationships with licensees, yet Plaintiffs failed to adequately investigate these problem areas. *Id.* We thus agreed with the district court that Plaintiffs had failed to present sufficient evidence from which a fact finder could find that Plaintiffs reasonably relied on the misrepresentations. However, as for the Securities Act claims, we concluded that Plaintiffs did, in fact, have standing because the securities had been obtained via an "integrated" (and thus public) offering. *Id.* at 6-12. We went on to observe, however, that although there was standing under the Securities Act, "Defendants do not make the related, seemingly more attractive argument that, due to the time of their investment decision, Plaintiffs could not

9

possibly have relied on the registration statement and therefore should not be entitled to maintain their claims under Section 11." *Id.* at 12. We noted several times that Plaintiffs made their investment commitment before the issuance of the registration statement. *Id.* at 6, 12, 13, 15, 16-17. Therefore, it was "conceivable" that Plaintiffs should not be permitted to recover under Section 11 since reliance on the registration statement was impossible. *Id.* at 13. We stated that this impossibility of reliance concept might "go to" the actual merits of the Section 11 claim. *Id.* at 16 n.9. Because Defendants had not directly raised the issue, however — but rather addressed it only obliquely in a footnote contained in a supplemental letter brief — we did not decide the point.

The case was then remanded to the district court, where Defendants filed a renewed motion for summary judgment on the basis of the "seemingly more attractive argument" alluded to in our prior opinion. The district court interpreted our discussion of the potential bar to Plaintiffs' Section 11 claim as a "road map." The district court first rejected Plaintiffs' argument that our repeated references to the timing of Plaintiffs' investment decision were dicta; instead, the court held that our conclusion that Plaintiffs made their commitment decision before the registration statement was new law of the case. In light of the timing of Plaintiffs' commitment and their sophistication and access to inside information, coupled

10

with their failure to conduct meaningful due diligence, the district court opined that "[t]rying to fit these investors within the class of individuals intended to be protected by the Securities Act is like trying to fit a round peg into a square hole." Relying primarily on *Guenther v. Cooper Life Sciences, Inc.*, 759 F. Supp. 1437 (N.D. Cal. 1990), which we had also referenced in our opinion, the district court held that summary judgment was appropriate because reliance under Section 11 was impossible on the facts of the case. Furthermore, even if impossibility of reliance was not a valid defense, the district court concluded that Plaintiffs could not establish loss causation and damages.

This second summary judgment ruling is at issue in this appeal. We affirm, but on a slightly different rationale.[3]

## II. STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment, applying the same legal standards as the district court. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1242-43 (11th Cir. 2003).

---

[3]At the time the first appeal was filed, Plaintiffs had three claims under the Securities Act: Section 11; Section 12(a)(2) [*see* 15 U.S.C. § 77l(a)(2)]; and Section 15 [*see* 15 U.S.C. § 77o]. During oral argument in the first appeal, Plaintiffs expressly abandoned their Section 12 claims, leaving only the Section 11 and Section 15 claims. As noted in our prior opinion, the Section 15 claim is derivative of the Section 11 claim. Consequently, if the Section 11 claim fails, then the Section 15 claim and this entire litigation — as it has been narrowed over the years — must necessarily fail.

## III. DISCUSSION

This case involves application of the so-called "commitment theory" to a claim brought under Section 11. The commitment theory in securities law appears to have begun as a means of establishing commencement of the statute of limitations for Rule 10b-5 claims, promulgated under the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)]. *See*, *e.g.*, *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972) ("[T]he time of a 'purchase or sale' of securities within the meaning of Rule 10b-5 is to be determined as the time when the parties to the transaction are committed to one another."); *see also Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1040 (2d Cir. 1992) (explaining that the commitment theory provides that "once plaintiff has committed itself to the transaction, the claim accrues and thus the statute begins to run"). Other courts have recognized that the commitment theory is not limited to the Rule 10b-5 statute of limitations context, but rather it may apply to claims brought pursuant to the Securities Act as well. *Westinghouse Elec. Corp. v. "21" Int'l Holdings, Inc.*, 821 F. Supp. 212, 215-16 (S.D.N.Y. 1993); *see also Pell v. Weinstein*, 759 F. Supp. 1107, 1113-14 (M.D. Pa. 1991) (applying commitment theory to a Section 12(2) claim; holding that because the plaintiffs' claims were based on misrepresentations in a prospectus that was filed only after there was commitment

12

to the sale of securities, "the sale could not possibly have been made by means of [the] prospectus"), *aff'd*, 961 F.2d 1568 (3d Cir. 1992). In such a circumstance, the commitment theory is based on the rationale that once the decision is made and the parties are committed to the transaction, "there is little justification for penalizing alleged omissions or misstatements which occur thereafter and which have no effect on the decision." *SEC v. Nat'l Student Mktg. Corp.*, 457 F. Supp. 682, 703-04 (D.D.C. 1978).

In deciding this appeal, we recognize that the issue for determination is one of first impression. As both the prior panel and district court acknowledged, and as the parties agree, hours of research have not uncovered any case directly on point. But there is, of course, a governing statute: Section 11. In interpreting this statute, which counsel for Plaintiffs fittingly described at oral argument as "tough" and "nasty," we are guided by the general principle of statutory construction that "statutory language must be read in the context of the purpose it was intended to serve." *United States v. Ballinger*, 395 F.3d 1218, 1237 (11th Cir.) (en banc), *cert. denied*, --- U.S. ---, 126 S. Ct. 368, 163 L. Ed. 2d 77 (2005); *see also Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 608, 99 S. Ct. 1905, 60 L. Ed. 2d 508 (1979). Stated differently, the *language* of a statute should not be considered in a vacuum and divorced from its underlying *purpose*. *See Ballinger*,

395 F.3d at 1237. Because the legislature is presumed to act with sensible and reasonable purpose, a statute should, if at all possible, be read so "'as to avoid an unjust or absurd conclusion.'" *Id.* (*quoting In re Chapman*, 166 U.S. 661, 667, 17 S. Ct. 677, 41 L. Ed. 1154 (1897)); *accord United States v. Mikelberg*, 517 F.2d 246, 252 (5th Cir. 1975) ("'A basic principle of statutory construction enjoins us from imputing to the Legislature an intent to produce an absurd result.'") (citations omitted) (binding precedent under *Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc)). Thus, in applying Section 11 to the facts of this case, we must always keep before us the underlying purpose of, and legislative intent behind, the statute.

Plaintiffs suggest in their initial brief that reference to the legislative history of the Securities Act is improper and "unnecessary" because the statute is unambiguous on its face. But, as indicated above, it is our responsibility to read and apply Section 11 in a manner that honors the legislative intent of Congress. Indeed, as Plaintiffs themselves acknowledge elsewhere in their brief, "[t]his appeal is fundamentally about the language *and legislative intent* of Section 11." (Emphasis added). To the extent these materials will assist in that regard, we may refer to the legislative history. *Train v. Colorado Public Interest Research Group, Inc.*, 426 U.S. 1, 96 S. Ct. 1938, 48 L. Ed. 2d 434 (1976) (expressly holding that

14

legislative history may be considered to determine congressional intent even if a statute is unambiguous on its face); *see also United States v. Elgersma*, 971 F.2d 690, 693 n.7 (11th Cir. 1992). In other words, and to be clear, we do not reference the legislative materials to contravene the clear and unambiguous will of Congress; instead, we use these materials as an additional resource to determine if Congress intended Section 11 to apply to a factual scenario like this case. *Cf. Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976) (looking to legislative history to support an interpretation of Section 10(b) of the Securities Exchange Act even though the statute was unambiguous). Relatedly, to the extent that we believe it would lead to an unreasonable result for Plaintiffs to obtain refuge under Section 11 on the facts as presented in this case, we may consider the legislative materials to ascertain statutory intent. *See United States v. American Trucking Ass'ns*, 310 U.S. 534, 543-44, 60 S. Ct. 1059, 84 L. Ed. 1345 (1940) (courts may look beyond the plain meaning of an unambiguous statute when that meaning will lead to "absurd or futile results," or an "unreasonable one" inconsistent with the policy of the legislation as a whole; further, when legislative materials are available and assist in determining statutory intent and meaning, "there certainly can be no 'rule of law' which forbids its use, however clear the words may appear . . .") (footnotes omitted); *see also Alabama*

15

*Power Co. v. F.E.R.C.*, 685 F.2d 1311, 1316 (11th Cir. 1982) ("[W]here the plain meaning [of a statute] leads to results that are absurd or at variance with the policy of the enactment, a reviewing court may seek guidance wherever available.").

A.      *Timing of Plaintiffs' Investment Decision and Commitment*

Early in this case, Defendants advanced a commitment theory argument by way of a motion to dismiss. The district court noted that under the terms of the merger agreement, "the obligations of each party to effect the merger were subject to the prior satisfaction of certain conditions." The district court thus held that the commitment theory was inapplicable because Plaintiffs "did not irrevocably commit themselves to the acquisition of Premiere stock by executing the Stockholder Agreements." In reaching this conclusion, the district court relied on three cases standing for the general proposition that, in order for the commitment theory to apply, the investment decision and commitment must be irrevocable. *See Westinghouse Elec. Corp. v. "21" Int'l Holdings, Inc.*, 821 F. Supp. 212, 215-16 (S.D.N.Y. 1993) (commitment theory applies once the investment decision is made and the parties are irrevocably committed to the transaction); *Pell v. Weinstein*, 759 F. Supp. 1107, 1114 (M.D. Pa. 1991) (applying commitment theory specifically because "plaintiffs lacked the power or authority to back out of the merger"), *aff'd*, 961 F.2d 1568 (3d Cir. 1992); *SEC v. Nat'l Student Mktg. Corp.*,

16

457 F. Supp. 682, 703-04 (D.D.C. 1978) (commitment theory inapplicable where merger agreement stated that obligations to proceed with merger were subject to performance of certain conditions and the parties "had no expectation or duty to proceed with the sales if the merger was aborted"). On summary judgment, Defendants asked that the district court reconsider its prior ruling on this issue. The district court denied Defendants' request, reiterating in its first summary judgment order that Plaintiffs were not "irrevocably committed" to acquiring the Premiere stock before the merger.

But, we stated several times in our prior decision that Plaintiffs had made their investment commitment before the filing of the registration statement and, therefore, reliance on the registration statement would have been impossible. The district court held on remand that these statements were not dicta; instead, the court ruled that our comments called its prior holding "into question" and were new law of the case. In light of this reading of our decision, the district court expressly held that "Plaintiffs made their investment decision prior to the issuance of the Registration Statement" and they "committed to purchase their shares prior to the issuance of the Registration Statement."

In this appeal, Plaintiffs did not challenge the above holding anywhere in their initial brief (nor did they do so directly in their reply brief). Rather, they

17

argued repeatedly throughout both briefs that the timing of their commitment was "irrelevant" for Section 11 purposes and that impossibility of reliance is no bar to their claim. While Plaintiffs' counsel took a different approach at oral argument, and suggested that Plaintiffs were not fully committed to the merger before the registration statement because their commitment was revocable, we do not consider claims not raised in a party's initial brief and made for the first time at oral argument. *See*, *e.g.*, *United States v. Nealy*, 232 F.3d 825, 830 (11th Cir. 2000); *Softball Country Club-Atlanta v. Decatur Federal Sav. & Loan Ass'n*, 121 F.3d 649, 654 n.9 (11th Cir. 1997); *Bigby v. United States Immigration and Naturalization Serv.*, 21 F.3d 1059, 1063 n.6 (11th Cir. 1994). Accordingly, it is not necessary for us to decide if the district court was correct in holding that the timing of Plaintiffs' investment commitment was law of the case. Rather, Plaintiffs waived the issue by not challenging that clear and express holding.

Perhaps anticipating this result, and recognizing that it may have a bearing on their case, Plaintiffs' counsel stated at oral argument his belief that Plaintiffs did, in fact, argue in their initial brief that the commitment decision was revocable. Counsel for Plaintiffs suggested that resolution of this issue boils down to "interpreting the words of the brief." Turning to the language in the initial brief does not help Plaintiffs, however. Plaintiffs did not raise this issue anywhere in

18

their statement of the issues. Instead, they described the pertinent issues as whether the district court erred in holding that reliance is an element of a Section 11 claim and whether impossibility of reliance is a valid defense thereto. Consistent with this framing of the issues, Plaintiffs argued several times in their initial brief that the timing of their investment decision and commitment is irrelevant. As reflected in their answer brief, Defendants understood this argument to mean that Plaintiffs were no longer claiming that their commitment was revocable. Defendants thus stated in their answer brief that "Plaintiffs now concede that they made their investment decision prior to the effective date of the Registration Statement," and, furthermore, "their commitment was binding." Plaintiffs responded directly to this claim in their reply brief, but they still did not argue that their commitment was revocable. To the contrary, they merely stated in response that "Plaintiffs' position is, and always has been, that the timing of their investment decision is *irrelevant* to their Section 11 claims. . . . Irrespective of when Plaintiffs decided to invest, the District Court was incorrect as a matter of law when it granted summary judgment based upon its ruling that that [*sic*] reliance was impossible." (Emphasis in original).

This "irrelevance" argument is to be contrasted with the argument that Plaintiffs made in opposition to Defendants' renewed summary judgment motion

19

in the district court. At that time, quoting from the district court's prior order, Plaintiffs argued that they "'had not irrevocably committed themselves to the acquisition of Premiere stock by executing the Stockholder Agreements.'" They were not irrevocably committed, Plaintiffs argued in the district court, because they could have invalidated the merger agreement and terminated the merger by a number of different means. By not clearly raising this or a similarly-phrased argument in their initial brief before this court (and making only passing, cryptic reference in their reply brief), we must conclude that Plaintiffs abandoned the argument. *See, e.g., Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.").[4]

In summary, we accept the prior panel's conclusion (and the district court's express holding on remand) that Plaintiffs made a binding investment commitment prior to the registration statement. We now proceed to consider the effect that holding has on the disposition of this appeal.

B.      *Impossibility of Reliance Under Section 11*

We begin here, as we must, with the language of the statute. In relevant part,

---

[4]Although Plaintiffs did not directly argue in their reply brief that their commitment was revocable, they did impliedly suggest that position while attempting to distinguish *Pell v. Weinstein*, 759 F. Supp. 1107 (M.D. Pa. 1991). They argued in passing that unlike the pre-registration statement commitment in *Pell*, Plaintiffs here could have terminated the merger "in a variety of ways," suggesting revocability. But, as noted above, we do not consider claims not *clearly* raised in a party's *initial* brief.

Section 11 provides:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue [five categories of persons therein named].

15 U.S.C. § 77k(a). The statute creates a presumption that "any person acquiring such security" was legally harmed by the defective registration statement. *See, e.g., Kirkwood v. Taylor*, 590 F. Supp. 1375, 1378 (D. Minn. 1984) ("[Section 11] in effect presumes that those who purchased stock in the public offering relied upon the allegedly misleading documents."), *aff'd*, 760 F.2d 272 (8th Cir. 1985). But, that presumption ends after an earnings statement which covers a period of at least twelve months after the effective date of the registration statement has become available. The statute then sets out the post-twelve months earnings period requirements:

> If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such

21

> person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.

15 U.S.C. § 77k(a). Intentional or willful conduct is not required under Section 11 and liability will attach even for "innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983); *see also Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 495 (7th Cir. 1986) (noting that Section 11 imposes "liability without fault"). To recover under the statute, a plaintiff need only show a material misstatement and/or omission in the registration statement and be able to "trace" the security he acquired to that defective statement. *Huddleston*, 459 U.S. at 382; *Barnes v. Osofsky*, 373 F.2d 269, 271-73 (2d Cir. 1967). That is, he must show that the security was issued under, and was the direct subject of, the prospectus and registration statement being challenged. *Barnes*, 373 F.2d at 273. However, as noted, a Section 11 plaintiff does not need to show that he actually relied on the registration statement unless he acquired the security "after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement." *See* 15 U.S.C. §

22

77k(a). To put it another way, "there is a conclusive presumption of reliance for any person purchasing the security prior to the expiration of twelve months." 1 Thomas Lee Hazen, The Law of Securities Regulation § 7.3[4], at 587 (4th ed. 2002); *accord Barnes*, 373 F.2d at 272; *see also Unicorn Field, Inc. v. Cannon Group, Inc.*, 60 F.R.D. 217, 227 (S.D.N.Y. 1973). Plaintiffs here did not acquire their Premiere stock after the issuance of a twelve-months earning statement. Therefore, if the Section 11 presumption applies, that would mean reliance is "conclusively presumed."

Before considering whether the Section 11 presumption applies, we must address Plaintiffs' threshold argument. Plaintiffs argue primarily that reliance is not an element of a Section 11 claim and, consequently, reliance is irrelevant to, and plays no role in, this case. That is only partly true. Plaintiffs are correct to the extent that reliance does not need to be *proven* (except post-earnings statement). Reliance is ordinarily *presumed*. *See*, *e.g.*, *Barnes*, 373 F.2d at 272. The statute's intended purpose as it concerns the presumption of reliance is well-documented. For example, various House and Senate bills relating to the Securities Act explain that when there is a defect in a registration statement, "the public shall be presumed to rely" on the defect. *See* H.R. 5480, 73d Cong., 1st Sess. § 9 (1933); *see also* S. 875, 73d Cong., 1st Sess. § 9 (1933); *accord* S. Rep. No. 47, 73d

23

Cong., 1st Sess. 4 (1933) ("S. Rep. No. 47") (stating that if there is a defective registration statement, "the buyer presumably relies" on the statement).

The concept of reliance was obviously important to Congress in drafting Section 11. The House Report accompanying the version of the bill that ultimately became the Securities Act explains that responsibility under Section 11 is enforced against "those who purport to issue statements for the public's reliance." *See* H.R. Rep. No. 85, 73d Cong., 1st Sess. 9 (1933) ("H.R. Rep. No. 85"). In fact, Congress made clear that the no-fault nature of Section 11 is specifically based on the legal principle that if one of two innocent persons must bear a loss, "he should bear it who has the opportunity to learn the truth and has allowed untruths to be published and *relied upon*. Moreover, he should suffer the loss who occupies a position of trust in the issuing corporation toward the stockholders, rather than the buyer of a stock who must *rely upon* what he is told." S. Rep. No. 47 at 5 (emphasis added). If reliance were irrelevant to the analysis, as Plaintiffs suggest, then no presumption would be required at all. To say that reliance is "presumed" is simply not the same thing as saying that reliance is "irrelevant." *Cf. Lewis v. McGraw*, 619 F.2d 192, 195 (2d Cir. 1980) (observing that shareholder cases which presume reliance on material misrepresentations and omissions under Section 14(e) of the Williams Act "did not abolish it as an element of the cause of action. Rather, they

held that in cases in which reliance is possible, and even likely, but is unduly burdensome to prove, the resulting doubt would be resolved in favor of the class the statute was designed to protect.").

The above discussion recognizes that the presumption of reliance was an important and relevant concern for Congress in drafting and promulgating Section 11. That much is clear. What must be decided in this case is whether Congress intended this presumption to apply (or whether a purchaser of security falls outside the reach and scope of the statute) when reliance is rendered impossible by virtue of a pre-registration commitment.[5]

Plaintiffs argue that Section 11 is the equivalent of a strict liability statute. Because their Premiere stock was eventually issued under a defective registration statement — and was not previously-issued stock already in the open market — Plaintiffs contend that they have established a prima facie case under Section 11. Although the Supreme Court of the United States has not gone so far as to hold that Section 11 imposes strict liability, the Court has made clear that the statute

_____

[5]Plaintiffs point out that the district court in *Westinghouse Elec. Corp. v. "21" Int'l Holdings, Inc.*, 821 F. Supp. 212 (S.D.N.Y. 1993) rejected the commitment theory under Section 11 because the statute does not contain "any reference to a . . . presumption that the plaintiff might have relied on the registration statement" and, therefore, "impossibility of reliance can be no bar to a § 11 claim." *Id.* at 218. While it is true that the statute itself does not specifically reference the presumption of reliance, it is well-documented that reliance factored heavily in the promulgation of Section 11. For this reason, and for the reasons to be further discussed *infra*, we respectfully disagree with the conclusion reached by the district court in *Westinghouse Electric*.

imposes a "stringent standard of liability" that is "virtually absolute." *Huddleston*, 459 U.S. at 381-82 (footnotes omitted). Plaintiffs interpret this language to mean that summary judgment was wrongly granted as to Defendants because the Section 11 presumption is strict and irrebuttable. However, Plaintiffs' argument presupposes that the Section 11 presumption applies in the first place. It does not.

First, as a matter of common sense, Plaintiffs are not entitled to the presumption in light of the timing of their investment decision and commitment. To hold otherwise would mean that an impossible fact will be presumed in Plaintiffs' favor. As to this issue, *Lewis v. McGraw*, 619 F.2d 192 (2d Cir. 1980), is analogous and instructive. That case involved a shareholder suit under Section 14(e) of the Williams Act [15 U.S.C. § 78n(e)]. The plaintiff shareholders alleged that the defendant board of directors made false and improper comments regarding a "friendly business combination" proposal by American Express. These comments allegedly frustrated a merger that would have resulted in a stock price increase of $15.00 per share. Although the plaintiffs conceded that no tender offer ever took place and that no shareholder was ever in the position to offer his shares to American Express at the stated price, they nonetheless contended that if they had been provided accurate and truthful information, the merger would have been consummated. The district court dismissed the complaint, holding that although

the plaintiffs alleged deception on the part of the defendants, they were unable to establish that anyone actually relied to their detriment on the deception.

On appeal, the plaintiffs in *Lewis* admitted that they could not establish reliance — which is a required element under Section 14(e) — because they were never given the opportunity to tender their shares; however, they rested upon cases holding that reliance may be presumed from a "showing of materiality." *Id.* at 195. The Second Circuit disagreed, concluding that while reliance may be presumed in Section 14(e) cases, that is only where it is "logical" to do so. *Id.* Thus, "where no reliance was possible under any imaginable set of facts, such a presumption would be illogical in the extreme." *Id.*; *see also Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 375 (2d Cir. 1973) (a presumption of reliance is proper "where it is logical to presume that reliance in fact existed"). Here, as in *Lewis*, it would be illogical to cloak Plaintiffs with a presumption of reliance. Plaintiffs made their investment decision and were legally committed to the transaction (and thus could not possibly have relied on the registration statement) months before the registration statement was in existence.

Furthermore, and more significantly, our review of the legislative history of Section 11 strongly suggests that Congress did not intend for the presumption to apply in a situation such as the one presented here. This is because when there is a

binding pre-registration commitment, the entire purpose of, and justification for, the presumption in the first place is non-existent.

In drafting Section 11, it appears that Congress assumed that only those who acquired their stock *after* the effective date of the registration statement would be affected by material defects, and it simply eliminated the requirement that they must prove that they had read and relied upon the defective registration statement. According to the Committee Report in 73d Congress, 1st Session H.R. No. 85 on H.R. 5480, at 10 (May 4, 1933), the presumption of reliance in Section 11 is specifically justified because, even though the purchaser may not read and rely on the registration statement, the misstatements and omissions contained therein are reasonably assumed to affect the market price and impel the purchase:

> Liability is imposed upon [defendants under Section 11] as a condition of the acquisition of the privilege to do business through the channels of interstate or foreign commerce. The statements for which they are responsible, although they may never actually have been seen by the prospective purchaser, because of their wide dissemination, *determine the market price* of the security, which in the last analysis reflects those manifold causes that are the *impelling motive of the particular purchase*. The connection between the statements made and the purchase of the security is clear, and, *for this reason*, it is the essence of fairness to insist upon the assumption of responsibility for the making of these statements.

(Emphasis added); *see also id.* at 9 ("The Committee emphasizes that [liability under Section 11 attaches] only when there has been an untrue statement of material fact or an omission to state a material fact in the registration statement or the prospectus — *the basis information by which the public is solicited.*") (emphasis added). Thus, as a matter of common sense reasoning, the presumption should only apply to those who purchase securities at the time of or after the registration statement. *Id.* at 22 ("Inasmuch as the value of a security may be affected by the information given in the registration statement, . . . the civil remedies accorded by this subsection against those responsible for a false or misleading statement filed with the Federal Trade Commission are given to all purchasers . . . regardless of whether they bought their securities *at the time of the original offer or at some later date.*") (emphasis added); *cf. In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 288 (S.D.N.Y. 2003) ("Those who purchase within twelve months *after* the registration statement becomes effective, and at any time until there is an earning statement 'covering a period of at least twelve months beginning after the effective date of the registration statement' need not prove reliance in order to recover.") (emphasis added); Louis Loss & Joel Seligman, Fundamentals of Securities Regulation 1234 (5th ed. 2004) (materiality under Section 11 is presumed "no matter whether the plaintiff purchased a day or a year

29

*after* the effective date of the particular part of the registration statement complained of") (emphasis added).

Courts and commentators have, therefore, recognized that the Section 11 presumption exists because of the relationship between the registration statement and the subsequent market price for the security. *See, e.g.*, *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. at 294 (commenting that when the Section 11 plaintiffs there purchased their stock they were presumed to have relied "on all public information about WorldCom's financial condition insofar as it was reflected in the market price of the WorldCom securities"); Krista L. Turnquist, Note, *Pleading Under Section 11 of the Securities Act of 1933*, 98 Mich. L. Rev. 2395, 2413 (2000) ("Section 11 does not require proof of reliance because the Securities Act presumes causation between a material misstatement or omission and the market price, so section 11 plaintiffs do not have to specifically plead that they read the registration statement."); Julie A. Herzog, *Fraud Created the Market: An Unwise and Unwarranted Extension of Section 10(B) and Rule 10B-5*, 63 Geo. Wash. L. Rev. 359, 401 (1995) (stating that while it may seem "incongruous" that Section 11 does not require proof of reliance, the reason for the presumption is apparent when one considers "the efficient market theory;" that is, if an efficient market exists, "enough investors will study the information and, through trading in

the securities, transfer the information to the market price").

William O. Douglas (later Justice Douglas), who wrote extensively on the Securities Act as a law professor and served as an early chairman of the SEC, explained the justification for the Section 11 presumption of reliance as follows:

> [T]he protection given to investors by Section 11 fills a long felt need in so far as it shifts the burden of proof. This is particularly desirable during the early life of the security. At that time the registration statement will be an important conditioner of the market. Plaintiff may be wholly ignorant of anything in the statement. But if he buys in the open market at the time he may be as much affected by the concealed untruths or the omissions as if he had read and understood the registration statement. So it seems wholly desirable to create a presumption in favor of the investor in this regard. If carried out logically, however, some time limitation might be placed upon this presumption, for in most cases after a year or so the statements made in the registration would have become outmoded and wholly discounted by a host of other factors. In other words, the present provision for reliance [which at that time did not contain the post-earnings statement exception] provides an excellent rule of thumb during the early life of the security. It has less justification the longer the security is outstanding.

William O. Douglas & George E. Bates, *The Federal Securities Act of 1933*, 43 Yale L.J. 171, 176 (1933). While there is, as Douglas opines, little justification for the Section 11 presumption at a certain point in time *after* the security is issued pursuant to a defective registration statement, there is even less justification for it

*before* the fact. Beforehand the investment decision and market price could not possibly have been affected, nor could the purchase have been "impelled," by a registration statement that was not yet in existence.

Further support for this conclusion can be found in the post-earnings statement exception to the presumption, discussed *supra*. This exception, which was added during the 1934 amendment to the Securities Act, places the burden on the purchaser to show that he actually relied on the defective registration statement if an intervening earnings statement has been issued. Congress explained that this provision was specifically based on the fact "'that in all likelihood the purchase and price of the security purchased after publication of such an earning statement will be predicated upon that statement rather than upon the information disclosed upon registration.'" *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081-82 (9th Cir. 1999) (*quoting* H.R. Rep. No. 1838, 73d Cong., 2d Sess. 41 (1934)); *Rudnick v. Franchard Corp.*, 237 F. Supp. 871, 873 n.1 (S.D.N.Y. 1965) (same). In other words, Congress made an exception to the Section 11 presumption when "in all likelihood" the purchase decision was based on factors other than the registration statement.

The logic underlying the post-earnings statement exception applies with equal, if not more, force to the situation at hand. It is not merely *likely* that

32

Plaintiffs' acquisition of the Premiere stock was based on factors other than the contents of the registration statement. Rather, because the registration statement did not exist at the time of the commitment, it is beyond dispute. It would be absurd to conclude that Congress intended to limit the Section 11 presumption when "in all likelihood" the stock purchase was motivated by other factors, and yet allow the presumption when it is an absolute *certainty*.

An analogy to the tracing requirement in Section 11 merely reinforces our conclusion. In order to have standing and prevail on a claim under Section 11 a plaintiff must be able to trace his stock to the defective registration statement. It is undisputed that if stock is purchased in a prior offering, and before a defective registration statement is issued, then no relief may be had as the pre-registration purchaser falls outside the scope of Section 11. *See*, *e.g.*, *Barnes*, 373 F.2d at 273. In *Turner v. First Wisconsin Mortgage Trust*, 454 F. Supp. 899 (E.D. Wis. 1978), for example, the plaintiff purchased her stock in August 1972, and the defective registration statement was filed six months thereafter, in February 1973. The district court dismissed the Section 11 claim, concluding that "[i]n order to have a claim under that section, the plaintiff must prove that she purchased a security which was issued in connection with such registration statement, which Turner obviously cannot do, having purchased prior to 1973." *Id.* at 911. Plaintiffs here,

33

by virtue of their binding commitment decision, effectively "purchased" their Premiere stock months before the registration statement was filed. It follows therefrom that they cannot have purchased pursuant to the registration statement, particularly since, under the affiliate letters, no registration statement was even required as to their shares.[6]

Such reasoning was also embraced by the court in *Guenther v. Cooper Life Sciences, Inc.*, 759 F. Supp. 1437 (N.D. Cal. 1990), which was cited by both the district court and the prior panel. In that case, a registration statement was filed on June 14, 1985, and was later amended on February 19, 1986. The plaintiffs there purported to represent a class of investors who purchased stock between June 17,

---

[6]It is true that Plaintiffs in one sense "acquired" their stock only after consummation of the merger and after the registration statement was filed. Regardless of when they may have physically acquired the stock, however, Plaintiffs made their investment decision, and were committed thereto, months before that time. *See, e.g.*, *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972) (the date of purchase or sale is to be determined "as the time when the parties to the transaction are committed to one another;" further noting that "commitment" in this context "marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time"); *Helman v. Murry's Steaks, Inc.*, 742 F. Supp. 860, 869-71 (D. Del. 1990) ("[O]nce the parties make the investment decision and enter into a binding commitment to perform the transaction, the purchase and sale is complete;" accordingly, "the purchase and sale in the present case took place . . . when the parties signed the Definitive Agreement and committed to the transaction, not when the securities were transferred for money."). This conclusion is not inconsistent with our prior opinion, wherein we held that "Plaintiffs did acquire their shares of Premiere pursuant to a public offering." That holding arose in the context of determining whether Plaintiffs had *standing* to pursue the Section 11 claims (that is, whether the stock was issued pursuant to a private or public offering). The standing holding did not fix the actual point in time that Plaintiffs were legally committed to the merger transaction, which the prior panel concluded was before the filing of the registration statement.

34

1985, and January 28, 1988. The defendants argued that the plaintiffs who purchased their stock between the filing of the initial registration statement and the filing of the misleading amendment could not trace their securities to a defective statement. *Id.* at 1440. The district court accepted this argument and, in so doing, noted that to rule in the plaintiffs' favor "would enable investors . . . to bring a section 11 action even though at the time they purchased their shares they could not possibly have relied on misleading registration statements, since none had been filed. Such a result would clearly contravene the purpose of section 11." *Id.*

And lastly, although it is not essential to our holding, it should not be forgotten that Plaintiffs were investors with access to inside information. As we held in the prior appeal, Plaintiffs had access to a wide range of information and knew of the stock issuance months before the registration statement was filed. They had the opportunity to learn (and, in fact, were on notice) of the potential problems with certain of Premiere's business relationships, its telephone calling card business, and the Orchestrate product of which they now complain. Congress has noted that liability under Section 11 is imposed and justified because members of the public are presumed to be "innocent" and, as compared with the issuers of stock, do not have the "opportunity to learn the truth;" instead, they are merely reliant upon what they are told. *See* S. Rep. No. 47 at 5. Plaintiffs do not appear to

fit that characterization. *Cf. Feit v. Leasco Data Processing Equipment Corp.*, 332

F. Supp. 544, 575 (E.D.N.Y. 1971) (intimating that a plaintiff may not recover

under Section 11 if it "knew [of] *or had available*" information that would have

revealed the untruth or omission contained in the registration statement) (emphasis

added).[7]

In sum, we hold that the Section 11 presumption of reliance does not apply

in the limited and narrow situation where sophisticated investors participating in

an arms-length corporate merger make a legally binding investment commitment

months before the filing of a defective registration statement.[8]

## IV. CONCLUSION

For the reasons noted above, we hold that the district court properly granted

summary judgment in favor of Defendants.

**AFFIRMED.**

---

[7]Plaintiffs argue that our prior holding as it concerns their failure to conduct due diligence is immaterial because they "allege a myriad of adverse material developments concerning Premiere that occurred during the two-and-one-half month period between the execution of the Stockholder Agreements and the dissemination of the Registration Statement." In other words, Plaintiffs claim it is of no moment that they did not conduct adequate due diligence because "Defendants ***never disclosed*** numerous such material facts that came into their possession ***after*** November 13, 1997 (*i.e.*, the date Plaintiffs signed the Stockholder Agreements and the end of the due diligence period)." (Emphasis in original). But, as we held in the prior appeal, these "myriad" issues were at least *generally* known to Plaintiffs during the due diligence period.

[8]Our rationale encompasses the lack of causation analysis the district court employed and, therefore, we do not find it necessary to separately address the district court's alternative holding that Plaintiffs could not establish loss causation and damages.